IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-01849-MSK-MEH

CAVITAT MEDICAL TECHNOLOGIES, INC.,

    Plaintiff,

v.

AETNA, INC.,

    Defendant.

## ORDER LIMITING SCOPE OF FED. R. EVID. 702 HEARING

THIS MATTER comes before the Court on several motions **(#338, #339, #340)** filed by the parties pursuant to Fed. R. Evid. 702.[1]  A hearing on these motions is currently set for May 17, 2006.

Many of the statements identified as expert "opinions" are not.  Some are assumptions or facts that may have been relied upon in the formulation of expert opinions.  The admissibility of assumptions and factual testimony are not determined by Fed. R. Evid. 702.  As a consequence, neither the validity of the assumption nor the factual statement will be considered at the Rule 702 hearing.  Without consideration of the admissibility of any testimony, the following chart categorizes the statements.

---

[1] Such motions supercede the previously filed motions **(#305, #306, #314)**, which are therefore denied.

## Douglas McSwane

| | | |
|---|---|---|
| 1 | Aetna did not have a formal written policy for the process of reviewing an approval of Clinical Policy Bulletins prior to 4/23/03. | Assumption or factual statement |
| 2 | Aetna's reliance on "peer reviewed published literature" as the key criteria in their determinations was inconsistent with insurance industry standards where FDA unqualified approval has been granted. | Opinion |
| 3 | Aetna knew or should have known in the health insurance industry that FDA approval is the primary criteria for decisions concerning designations as to the experimental and investigational status of medical technologies. | Opinion |
| 4 | Aetna deliberately ignored methodologies most common in the industry. | Assumption or factual statement |
| 5 | PCB-642 was developed and published by Aetna in response to pressure from SAIC's ethics committee. | Assumption or factual statement |
| 6 | Aetna's decision to categorically deny payment for Neuralgia Inducing Cavitational Osteonecrosis (NICO) and CAVITAT Ultrasonography was malicious. | Opinion |
| 7 | Aetna's decision to categorically deny payment for NICO and CAVITAT Ultrasonography was unjustified. | Opinion |
| 8 | Aetna did not comply with common industry due diligence investigations. | Opinion |
| 9 | Aetna gained financially and gained an unfair advantage in the health insurance marketplace. | Opinion |
| 10 | Aetna was unfair and malicious. | Opinion |
| 11 | Aetna disregarded or selectively used certain provisions of the FDA approval to justify their decision to deny payment for NICO and CAVITAT. | Assumption or factual statement |
| 12 | Aetna implied the FDA approval was granted based on less than adequate documentation yet they made no effort to review the FDA records to verify their position. | Assumption or factual statement |
| 13 | Aetna failed to fairly consider the American Medical Association (AMA) letter dated March 1, 2000, which essentially gave approval for CAVITAT Ultrasonography. | Opinion |

| 14 | Aetna cited an article by Dodes and Schissel and Quackwatch without adequate research to determine truthfulness. | Assumption or factual statement |
|---|---|---|
| 15 | Aetna knew or should have known that most if not all other third party payors, i.e., Medicare, Medicaid, Champus/Tricare, Major Insurance Companies, HMS's, PPO's, etc. had not designated NICO and CAVITAT Ultrasonography as "experimental and investigational." | Opinion |
| 16 | Aetna created CPB-642 to unjustly maximize their own financial gain at the expense of the policyholders, providers and CAVITAT. | Opinion |
| 17 | There is no evidence that CAVITAT submitted false claims or committed fraud in any manner. | Opinion |
| 18 | Aetna knew or should have known any unsubstantiated allegation to fraud in any publication available to the provider community, insurance companies, Aetna policyholders and providers, state and national government agencies, etc. could create a fear of possible fraud audits, professional disbarment and malpractice claims which would be devastating financially and professionally to medical providers who continued to treat patients for NICO and CAVITAT. | Opinion |
| 19 | Aetna knew that citing and publishing the document authored by Dodes and Schissel and Quackwatch could cause many providers, out of fear, to unnecessarily discontinue treating NICO patients and utilizing CAVITAT Ultrasonography to the detriment of the policyholders, the providers and CAVITAT. | Assumption or factual statement |
| 20 | The evidence is clear that Aetna decided not to investigate Dodes and Schissel and Quackwatch before citing their allegations thereby disregarding the possible but undeserved devastating effect on certain providers and CAVITAT. | Opinion |
| 21 | Aetna's denial of benefits to its policyholders for treatment was unjustified and malicious. | Opinion |
| 22 | Aetna's denial of benefits to its policyholders for treatment of NICO and CAVITAT Ultrasonography while other health insurers paid for this treatment created an unfair market advantage to Aetna at the expense of policyholders. | Opinion |

**William P. Glaros**

| 1 | Cavitation lesions do exist. | Opinion |
|---|---|---|
| 2 | Cavitation lesions are pathological. | Opinion |
| 3 | Current treatment of NICO cavitation lesions is effective. | Opinion |
| 4 | Cavitat is effective in assisting in diagnosis and treatment of cavitation lesions. | Opinion |

**Kevin Call**

| 1 | The economic damages suffered by Cavitat relative to the alleged wrongful conduct of the Defendant range from approximately $61,200,000 to $72,600,000. | Opinion |
|---|---|---|
| 2 | Cavitat was an entity with reasonable expectations of continuing in existence prior to the alleged wrongful conduct by Aetna. | Assumption |
| 3 | Cavitat would have optimally licensed Cavitat technology in approximately March 2003, but for the alleged wrongful conduct of Aetna, and received royalty payments therefrom. | Assumption |
| 4 | Prior to March 2003, Cavitat would have continued to manufacture and sell Cavitat devices directly to the medical and dental communities. | Assumption |
| 5 | Cavitat's lost profits prior to March 2003, based upon a lost incremental profits methodology, are $822,994.00. | Opinion |
| 6 | Cavitat's lost profits after March 2003 can or should be calculated through February 2018 using "reasonable royalties." | Opinion |
| 7 | Cavitat technology was and would have continued to be licensed on an exclusive basis to one manufacturer for world-wide distribution. | Assumption |
| 8 | The legal duration of the patented technology could have extended to at least February 2018 and thus an exclusive license to Cavitat Technology would have effectively run through this period of time. | Assumption |
| 9 | CMTI or a licensee of Cavitat technology could have reasonably expected to enjoy a substantial monopolistic position in the marketplace through February 28, 2018. | Assumption |

| 10 | Any projection of the CMTI revenue trend through fiscal 2018 would exceed a reasonable market estimate for Cavitat devices. | Opinion |
|----|---|---|
| 11 | The total market for Cavitat devices is 143,935 units through 2018 and CMTI and/or its exclusive licensee would have sold this number of Cavitat devices. | Assumption or factual statement |
| 12 | Cavitat's assumed, substantial monopolistic position in the marketplace through February 28, 2018, would likely place a negotiated royalty rate at the higher end of a reasonable range. | Assumption |
| 13 | The product life cycle adopted by Kevin Call is reasonable after considering the various facts and circumstances of this case. | Opinion |
| 14 | The base price of a Cavitat machine of $26,000 would continue through the end of the damage period with no future reductions in sales price as a reaction to competition. | Assumption |
| 15 | A better, conservative hypothetical cost structure for CMTI results in an estimating operating profit margin of 21.13%. | Opinion |
| 16 | A reasonable return on investment for the licensee of Cavitat would range from 35% to 45%. | Opinion |
| 17 | It would be reasonable to anticipate the CMTI would accept a reasonable royalty rate with an implied rate of return between 20% and 25%. | Assumption |
| 18 | A reasonable range of comparable royalty rates for Cavitat technology is 5% to 10%. | Opinion |
| 19 | A reasonable royalty rate for the use of Cavitat is 7% of sales revenue. | Opinion |
| 20 | The present value of Cavitat's lost royalty payments ranges between $59,911,660 and $71,260,820. | Opinion |

At the Rule 702 hearing, the Court will determine whether the opinions are admissible. It will not consider the expert reports; such reports are discovery devices and hearsay. If desired, a party may offer a witness' curriculum vitae in lieu of testimony on the expert's qualifications.

**IT IS THEREFORE ORDERED** that:

(1)    The previously filed Rule 702 motions **(#305, #306, #314)** are **DENIED**, as

        superceded by the amended motions.

(2)      The evidence to be presented at the Rule 702 hearing shall be limited to determining the admissibility of opinions.

Dated this 13th day of April, 2006

                                   **BY THE COURT:**

*[signature: Marcia S. Krieger]*

                                   Marcia S. Krieger
                                   United States District Judge